UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA, )
 )
        Plaintiff, )
 )
  v. ) No. 4:09 CR 641 HEA/DDN
 )
RELDA STEWART, )
 )
        Defendant. )

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

    This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

    Defendant Relda Stewart is charged by indictment in Counts 1 through 3 with aggravated identity theft and in Counts 4 through 6 with identity theft. Pending before the court are the following four matters:

1. an oral motion of defendant to suppress evidence (Doc. 13);
2. an oral motion of the government for a determination of the admissibility or not of any arguably suppressible evidence (Doc. 14);
3. a documentary motion of defendant to suppress evidence (Doc. 52); and
4. a second documentary motion of defendant to suppress evidence (Doc. 68).

    In their pre-hearing memoranda the parties identified several categories of arguably suppressible evidence, including:

a. a statement of defendant described in a November 2002 Chesterfield police report;
b. a statement of defendant described in a November 2003 Chesterfield police report;
c. physical evidence and statements of defendant described in a March 2007 Des Peres police report;
d. a statement of defendant described in a September 2009 Deerfield, Illinois police report;

e.  evidence and statements set forth in a St. Louis County police report of incident on September 3, 2009;

f.  evidence seized in the execution of a search warrant on defendant's motor vehicle;

g.  recorded telephone conversations of defendant;

h.  grand jury testimony given by defendant;

i.  a May 31, 2007, statement by defendant during a telephone call to a police officer; and

j.  evidence obtained during an incident in Fenton, Missouri.

Hearings were held on these matters on April 7 and 9, 2010. Following the hearing, a transcript of these proceedings was requested, prepared, and filed.

From the evidence adduced on the pending matters, the undersigned makes the following findings of fact and conclusions of law:

## **FACTS**

### November 2003

1. On November 20, 2003 Relda Stewart created a disturbance at the Gap retail store at Chesterfield Mall in Chesterfield, Missouri. Stewart was in the store attempting to return a sweater valued at about $150. The clerk requested a photo identification from Stewart, to comply with the Gap store's policy. Stewart became upset because she was required to show identification; she laid her wallet face-up on the counter to show her identification. The clerk then took the identification and laid it by the cash register. Stewart became very upset that the identification document was being exposed to public view. The store manager stepped up to calm Stewart. Stewart remained upset and made an oral statement that the store personnel considered to be physically threatening toward them. Police Officer Kim Beckmann was dispatched to the store. Before Officer Beckmann arrived, Stewart left the store.

2. On November 21, 2003, and again several days later, Officer Beckmann displayed a separate photo lineup[1] to each of the three Gap store employees. He showed the lineup at different times and to the employees separately. All three of the employees identified Stewart as the customer who created the disturbance at the Gap store. Officer Beckmann then issued a wanted status for Stewart's arrest for peace disturbance. He continued to investigate the incident involving Stewart and applied to the Chesterfield City Prosecuting Attorney for an arrest warrant for peace disturbance. Thereafter, an arrest warrant was issued for Stewart.

February 2004

3. On February 10, 2004, Officer Beckmann and other officers were dispatched to the Chesterfield Mall because a larceny or theft was reported to be in progress in a Wet Seal retail store at the mall. Two black females were reported involved in the incident and their descriptions were broadcast to officers in the mall. An officer on foot patrol in the mall saw the women, whom he identified from the broadcast descriptions, one of whom was Relda Stewart. The patrol officer knew there was an outstanding warrant for Stewart and he attempted to take her into custody, but she resisted. Officer Beckmann and another officer were able to place Stewart in custody and book her for peace disturbance.[2]

4. Shortly after Stewart's arrest, Officer Beckmann searched Stewart's purse and found 15 items of clothing in it. The items of clothing were from four of the stores in the Chesterfield Mall and they still had price tags on them. Also, Stewart did not have a shopping bag for these stores. Officer Beckmann asked her what the items were in her

---

[1] The three photo lineups were later destroyed by the police department pursuant to a court order after the local case against Stewart was completed.

[2] Two months later, the prosecuting attorney issued a summons to Stewart for the peace disturbance.

purse[3] and Stewart said that, before the police came up to her, her shopping bag had become damaged and she placed the items in her purse. Officer Beckmann asked her for the store receipts for the merchandise; Stewart said she did not have them with her.[4]

5. Officer Beckmann seized from Stewart's purse was either a shirt or a blouse from the Wet Seal store for which Stewart did not have a receipt.

6. Officer Beckmann then told Stewart that the Chesterfield police would hold the items, for which she did not have receipts, for seven to ten days, and that, if she brought a receipt to the police department for an item, the item would be returned to her. If no receipt was produced after that period of time, the items would be returned to the store. After ten days, Stewart had not brought to the police department a receipt for any of the items. Therefore, the items were returned to the stores.

April 2007

7. On April 30, 2007, Des Peres, Missouri Police Detective Trent Koppel was employed in his off-duty time as a security officer at the shopping mall in Des Peres. While thus employed, he received a phone call from the Des Peres mall Macy's Department Store loss prevention department that Relda Stewart[5] was making a purchase using a possibly false name. He was told that Stewart had a history of causing disturbances in the store when store personnel would not allow her to complete transactions.

8. Koppel ran Stewart's name through the computer and saw that there was an outstanding arrest warrant for her; the warrant related to an incident inside the Macy's store that occurred the preceding week.

---

[3]Officer Beckmann had not given Stewart her <u>Miranda</u> rights before asking her this question.

[4]Counsel for the government has stated that it will not use in its case-in-chief at trial these oral statements made by Stewart while in custody and in response to interrogation. (Doc. 80, trans. at 99-100.)

[5]The store personnel told Det. Koppel that they knew that the subject was Relda Stewart from prior incidents.

- 4 -

Det. Koppel, accompanied by private security officer Daniel Milberg, arrived at the Macy's store shortly after he was called. When he arrived, he saw Relda Stewart at a cashier's counter in the fine jewelry department completing the purchase of a Gucci watch, priced at $941.28, in the name of A.W., using two merchandise credit slips. In such a transaction, store policy required that the customer sign the credit slip receipts. Stewart did so in the name of A.W.

9. Det. Koppel walked up to Stewart and, without touching her or placing her under arrest, asked her whether she was Relda Stewart. Stewart answered that she was not Stewart but was the person whose name she had signed to purchase the watch. Det. Koppel told her that he did not believe her and asked for proof of identification. Stewart then insisted that she was not Relda Stewart. Koppel then told her that he believed she was Relda Stewart and that there was an arrest warrant for her. Stewart then said that she had already taken care of the warrant and confirmed to Koppel that she was Stewart. Because Stewart had said that she had taken care of the warrant, Det. Koppel ran her name again and saw that the warrant was still active. He then placed her under arrest on the active warrant.

10. After her arrest, Det. Koppel seized from Stewart's person the merchandise transaction receipt. He then took her to his police car.

11. After searching Stewart for security purposes, Det. Koppel placed her in the secure rear seat of the police vehicle. After she was seated in the vehicle, he saw her move around in the back seat. Thinking she might be hiding something, for security purposes he had her step out of the vehicle and he re-searched her. At this time he found in the back right pants pocket a Missouri identification card in the name of T.B., believed to be another fraud victim.

12. Det. Koppel then said to Stewart, "This isn't even you." Stewart said the card belonged to her friend and that she was allowed to have it.

13.  In connection with this arrest of Stewart, Det. Koppel took custody from Macy's of the Gucci watch[6] and two merchandise credit slips that Stewart had signed in the name of A.W. Koppel seized from Stewart the watch transaction receipt.

May 2007

14.  On May 1, 2007, Det. Koppel showed a six-person photo array to two members of the Nordstrom's store personnel. The six photos are of black women. (Def. Ex. A) Each subject appears to be similar in age and appearance. Each of the two employees observed the array separately from the other and each identified Stewart's photograph.

15.  On May 3, 2007, Det. Koppel returned to the mall and displayed a six-picture photo array to a Macy's store employee who had been involved in the April 30 incident; this person chose the photo of Relda Stewart without hesitation. (Gov. Ex. 4B.)[7]

16.  Thereafter, Koppel received from Macy's a copy of the video recording of the March 31 incident made by Macy's loss prevention office security camera.

17.  On account of the April 30, 2007 incident at the Macy's store, that retail store mall banned Stewart from going onto the mall property generally for a period of three years.

18.  On May 31, 2007, Det. Koppel contacted A.W., the victim, about the April 30 watch incident. A.W. denied knowing Relda Stewart. Shortly after concluding this conversation, Det. Koppel received a phone call from Stewart who at the time was represented by legal counsel. In this phone call Stewart asked Det. Koppel why he had contacted A.W. and said only that she did not believe that A.W. was a victim. Stewart then hung up the phone.

---

[6] Later, the police returned the watch to the Macy's store.

[7] The copy of the Government Exhibit 4B photo array depicts 4 subjects (Nos. 1, 3, 4, and 5) sufficiently to indicate that they are of similar age and appearance as defendant, as she is depicted in position No. 2 on Defendant Exhibit A. In Government Exhibit 4B, subjects Nos. 2 and 6 are not sufficiently discernable for the court to determine their similarity.

## January 2008

19. In January 2008, the trial of Relda Stewart began for the April 30, 2007, trespass charges involving the Macy's store. On January 4, during the trial, Det. Koppel received a phone call from the Des Peres, Missouri, Nordstrom's retail store advising him that a short time earlier Stewart had been in that store and had engaged in a questionable purchase transaction. When being questioned about the transaction by store personnel, Stewart became physically aggressive with the sales clerks and used vulgar language.

20. On January 18, 2008, Det. Koppel displayed the 6-picture photo array, identified as Government Exhibit 4B, to employees of the Nordstrom's store at the Des Peres, Missouri, retail store mall. Both employees identified the photograph of Stewart as being involved in an incident at the mall on January 4, 2008. Thereafter, the state prosecuting attorney issued a summons against Stewart for trespass onto the Nordstrom's premises. In his investigation of this incident, Det. Koppel acquired surveillance photographs of Stewart in the Nordstrom's store which were taken by the Nordstrom's security office camera.

## September 3, 2009

21. On September 3, 2009, St. Louis County Police Detective Charles Faasen was at the Walmart Store in Fenton, Missouri, investigating a case that did not involve Relda Stewart. While engaged in that investigation, he was contacted by the Walmart loss prevention department and asked to stand by while Relda Stewart completed a transaction in the store. He was told that the store had had some issues with her in the past. So, he walked to about 15 feet away from the retail counter where Stewart was conducting her business. He was dressed in a dress shirt, tie, and suit pants, but no jacket. His officer's badge was in open view, attached to his belt next to his holstered revolver.

22. From this location, Det. Faasen saw Stewart provide one of the store managers a driver's license as identification, in order to complete the return of electronic merchandise. After Stewart had given the driver's license to the manager, the manager took it to the nearby

store loss prevention agent.  Then Stewart walked over and grabbed the license back.  In doing that, Stewart grabbed at, pushed, and struck the store manager and the loss prevention agent.

23.  Det. Faasen stepped up to Stewart and told her she was under arrest for identity theft.[8]  Stewart refused to put her hands behind her back, as he directed, so that he could handcuff her.  She said, "I'm not going to do that" and kept pulling away.  Det. Faasen then applied physical pressure to Stewart's wrist (a wrist lock), because she would not allow him to handcuff her.  As soon as he did this, she stopped struggling and he was able to direct her back to the store's loss prevention office.

24.  Det. Faasen and Stewart entered the Walmart store's loss prevention office, a room approximately 15 feet by 15 feet.  The only other person in the room was a store loss prevention agent.  At no time when she was in the Walmart loss prevention office was Stewart handcuffed or otherwise physically restrained.  From that office, Det. Faasen called for another police officer to come to that office to write a report of the incident.  Officer David Doyle responded and arrived about ten minutes later.  During those ten minutes, Det. Faasen patted Stewart's pockets for any weapon and then placed her purse on the table in front of her; he opened and looked in the purse to be sure it did not contain a weapon.  He found none.

25.  After Officer Doyle arrived, Det. Faasen gave him the driver's license that Stewart had given the store manager and he explained to Doyle what had happened.  Faasen told Doyle that a Walmart employee had asked him to stand by when the store personnel had recognized Stewart from earlier incidents.  Faasen told Doyle that there was a scuffle between Stewart and the store managers as they tried to examine Stewart's identification, which turned out not to be Stewart's identification.  Officer Doyle seized the identification document as evidence.

26.  Next, without being asked any question, in the presence of both Doyle and Faasen, Stewart spoke up and said that she was using her

---

[8]He arrested her for identity theft, because she was using someone else's identification for monetary gain.

sister's ID to return her sister's merchandise because her sister was working. Stewart also spontaneously stated that she did returns regularly with other people's IDs.

    27.    Officer Doyle then asked Stewart where the merchandise came from that she had been trying to return. Stewart responded that it had been her sister's from New York. Officer Doyle asked Stewart about the driver's license.[9]

    28.    Later, Officer Doyle took Stewart to the St. Louis County Justice Center for incarceration regarding this identity theft incident. During this 20 minute drive, the officer did not ask Stewart any questions. However, Stewart stated spontaneously that she was concerned about why she was being charged with assault. Officer Doyle explained the basis for the assault charge. Without being asked any question, Stewart stated that she did not understand the charge because she did not assault anyone.

    29.    During his investigation, Office Doyle seized the following items:

1. a Duracell, DR9678 battery;
2. several video games: The Sims-3, Call of Duty, World at War, Dawn of Discovery, Empire Total War, Battle Station Pacific, and Prototype;
3. a Mad Cats Wireless headset for PS3;
4. a Zeno Mini acne clearing device and a replacement tip;[10]
5. 2 Walmart Visa cards; and
6. 5 blank Visa cards seized from Stewart's purse.

    30.    Officer Doyle also obtained from Walmart surveillance photographs of the incident taken by Walmart surveillance cameras and the merchandise that Stewart tried to return, including batteries and

---

[9] Counsel for the government has stated that it will not use in its case-in-chief at trial these oral statements made by Stewart while in custody and in response to interrogation, because Stewart had not been advised of her Miranda rights. (Doc. 80, trans. at 99-100.)

[10] See http://shop.ebay.com/ items/ zeno%20mini?_dmd=2&_cpr=249&rvr_id=&keyword=zeno+mini&crlp=4183623277_9413&MT_ID=70&tt_encode=raw&adgroup_id=1532202667 (last viewed on May 13, 2010).

video games.  At some time, store gift cards were seized from inside Stewart's purse.  And the police also seized a Walmart register receipt.

31.   During the September 3, 2009 incident, neither Det. Faasen nor Officer Doyle gave Stewart her <u>Miranda</u> warnings.

September 4, 2009

32.   On September 4, 2009, Special Agent Thomas Brady[11] and Des Peres Police Det. Koppel interviewed Relda Stewart in the St. Louis County Justice Center (Jail) where she was then incarcerated. Before this interview, Stewart had not invoked her right to counsel.  The interview occurred in an interview room in the jail.  The room had a glass window and contained a table.

33.   (a)   As soon as Det. Koppel walked into the interview room, Stewart, without being asked any questions, immediately said, "What are you doing here?"  In response, Det. Koppel said, indicating Agent Brady, "This person needs to talk to you."  Agent Brady then identified himself and stated he was there to investigate the charge of identity theft from the day before.  Then, without being asked any question, Stewart began speaking, saying, "My sister [(A.M.)] gave me her ID to use so I could return some items for her."  Stewart also stated that her sister had waited outside the Walmart store in the parking lot, and that they should just contact her sister who would tell them everything.

(b)   Agent Brady asked if there was a way for him to contact her sister and Stewart gave her sister's address and telephone number to him.  Stewart added that, if they wanted any more information, the officers could talk with her attorney, Joel Schwartz.  When Stewart mentioned the attorney, the interview ended.  Agent Brady had no other contact with Stewart.

34.   During this interview, neither Det. Koppel nor Agent Brady advised Stewart of her <u>Miranda</u> warnings.

35.   In his investigation of Stewart, Agent Brady obtained digital video disks from Walmart security personnel that contained surveillance

---

[11]Social Security Administration Office of the Inspector General.

- 10 -

photographs and video pictures of Stewart.  Walmart had acquired this evidence in the operation of its business, without any involvement by the government or the police.

June 2009

36.   On June 12, 2009, Relda Stewart was involved in a retail theft at a Deerfield, Illinois, store.

September 2009

37.   On September 24, 2009, at an Ulta Cosmetic retail store in Deerfield, Illinois, Relda Stewart was arrested for theft.  At the time of her arrest, Stewart told the officer that she would not make any statement because her father was an attorney.  The police obtained from the store the following items: cell phone merchandise that Stewart was charged with stealing and currency involved in the incident.  Later, the arresting officer told Police Detective Juan Mazariegos what Stewart had said in this regard.

38.   Thereafter, in his investigation of the June 12, 2009, incident, Det. Mazariegos showed the employees of the Ultra Cosmetic store a 6-picture photo array.[12]

### DISCUSSION

Defendant argues in her first documentary motion to suppress that the court should suppress as evidence any statements she made to law enforcement officers, because they were (a) coerced, (b) made without having been advised of her Miranda rights, and (c) made after she was unlawfully arrested.  (Doc. 52.)  She also seeks to suppress physical evidence illegally seized from her person without a warrant.  (Id.)

In her second documentary motion to suppress, she seeks suppression of evidence acquired during approximately 19 incidents occurring at retail stores; evidence acquired during the execution of a search warrant at defendant's residence; evidence acquired during the execution

---

[12]This photo array was not offered or received into evidence during the suppression hearing.

of a search warrant on defendant's vehicle; statements recorded during Title III wiretaps; and grand jury testimony by defendant. (Doc. 68.)

Generally, on motions to suppress evidence, the government bears the burden of establishing that evidence acquired without court process such as a search warrant was lawfully acquired. E.g., United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005)(government bears burden of proving by a preponderance of the evidence that an assertedly consensual search was voluntary); United States v. James, 353 F.3d 606, 615-6 (8th Cir. 2003)(government bore burden of proving that evidence was abandoned). Where evidence was acquired with legal process, the defendant bears the burden of establishing that the evidence was nevertheless acquired unlawfully. E.g., United States v. Garcia, 785 F.2d 214, 222 (8th Cir. 1986)("Moreover, those against whom the resulting evidence is admitted have the burden of proving the wiretapping was unlawfully obtained or used"). Also, when relevant, the defendant has the burden of proving that she has standing to complain about a seizure of evidence, i.e., that she had a legitimate expectation of privacy in the area searched. United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008).

The court has discerned from the hearing record that the issue of whether evidence should be suppressed relates to five categories of evidence: (1) photo arrays presented to witnesses; (2) arrests and the evidence seized in searches incident to those arrests; (3) custodial statements made in response to interrogation; (4) custodial statements not made in response to interrogation; and (5) physical evidence not obtained from defendant.

### 1. Photo arrays

Police officers displayed photographic arrays to witnesses on November 21, 2003 (Findings 2-3); May 3, 2007 (Finding 14); a date following May 3, 2007 (Finding 15); and January 18, 2008 (Finding 20).

Under the Due Process Clause, identification evidence must be suppressed if it results from procedures that are unnecessarily suggestive and that may lead to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Such an identification, however, may

be admissible if it is nonetheless reliable.  Neil v. Biggers, 409 U.S. 188, 198 (1972). Reliability depends upon (1) the witness' opportunity to view the suspect at the time of the crime; (2) the witness' degree of attention at the time of the crime; (3) the accuracy of the witness's description of the suspect prior to the identification; (4) the witness's level of certainty at the time of the identification; and (5) the length of time between the crime and the identification.  Manson v. Brathwaite, 432 U.S. 98, 114-16 (1977).

In the instances before the court, witnesses viewed several photo arrays.  The first is Government Exhibit 4B, which relates to the identifications made by two Nordstrom employees on May 3, 2007, see Finding 15, and by two Nordstrom employees on January 18, 2008, see Finding 20. Another is Defendant Exhibit A, which was shown to a Macy's employee on May 1, 2007.  See Finding 14.

Regarding Defendant Exhibit A, the exhibit is sufficiently clear and testimony about the procedure used establishes that the procedure was not suggestive and would not reasonably lead to an irreparably mistaken identification.  While Government Exhibit 4B does not clearly depict two of the photo subjects, the testimony indicates that the procedures used in its display rendered the identifications nevertheless reliable.  The employees viewed the array separately, at times reasonably close to the incident, and they were certain in their identification.

For these reasons, the identifications based upon the displays of photo arrays Government Exhibit 4B and Defendant Exhibit A should not be suppressed.

## 2. Arrests and searches incident to arrests

Defendant was arrested on November 10, 2004 (Finding 3); April 30, 2007 (Finding 9); September 3, 2009 (Finding 23); and September 24, 2009 (Finding 37).

Probable cause to arrest with or without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the defendant committed an offense or was then committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964).  This determination does not depend

on individual facts, but upon the cumulative effect of the facts known in the totality of the circumstances. United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995).

On February 10, 2004, defendant was arrested by Officer Beckmann based upon an arrest warrant issued in November 2003. November 20 and 21, 2003, at the Gap store, the police were told that defendant physically threatened store personnel during a merchandise transaction and store personnel identified defendant as the individual involved. On April 30, 2007, at the Macy's store, Det. Koppel personally knew there was an outstanding arrest warrant for defendant. On September 3, 2009, at the Walmart store, Det. Faasen personally observed defendant push and strike store personnel, and then resist his efforts to take her into custody. On these occasions, the officers had sufficient information reasonably to believe either that a warrant existed for the defendant's arrest or to believe that defendant had committed a criminal offense in the officer's presence. Such circumstances indicate the existence of probable cause and the lawfulness of the arrests of defendant.

Items of evidence may be seized without a warrant, if seized incident to a lawful arrest. United States v. Burtton, 599 F.3d 823, 830 (8th Cir. 2010). During the arrests on February 10, 2004 (see Findings 3-4), and April 30, 2007 (see Findings 9-13), items of evidence were lawfully seized from defendant without a search warrant because the seizures were incident to her lawful arrests.

No evidence was seized from defendant incident to her arrest on September 3, 2009 (Findings 23-24). And while no evidence was adduced of the circumstances of defendant's warrantless arrest in Deerfield, Illinois, on September 24, 2009, the record does not indicate that any physical evidence was seized from her on that occasion.

For these reasons, the evidence seized from the person of defendant without a search warrant should not be suppressed.

### 3. Statements made by defendant

The government has the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986); Lego v.

Twomey, 404 U.S. 477, 489 (1972). The admissibility of a defendant's statements depends upon whether the statements are constitutionally voluntary, Connelly, 479 U.S. at 163-67; and, when the statements are made during police interrogation while the defendant was in custody, whether the defendant had been advised of her Miranda rights, and, if so, whether the defendant knowingly and voluntarily waived the rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979). The admissibility of statements does not require that they be preceded by an advise of rights, if the person who made the statements either was not in custody or was not the subject of interrogation when the statements were made. Miranda v. Arizona, 384 U.S. 436, at 444-45, 467-68, 478 (1966).

Voluntariness of defendant's statements

The government has shown that all of the statements made by defendant were voluntary. None of the statements described in the evidence adduced before the undersigned was the result of government overreaching, such as physical mental or physical coercion, deception, or intimidation. Connelly, 479 U.S. at 167; Moran v. Burbine, 475 U.S. 412, 421 (1986); United States v. Jordan, 150 F.3d 895, 898 (8th Cir. 1998); United States v. Goudreau, 854 F.2d 1097, 1099 (8th Cir. 1988).

Non-custodial statements by defendant

The Eighth Circuit has recognized six indicia of being in custody for Miranda purposes:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official request to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; and (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Brown, 990 F.2d 397, 399 (8th Cir. 1993).

While defendant was never advised of her Miranda rights in the incidents described in the hearing, she made many uncoerced statements to store personnel and to police officers without then being in custody for Miranda purposes. The evidenced statements were made on November 20, 2003, in the Gap store (Finding 1); on April 30, 2007, in the Macy's Department store (Findings 8 and 9, before being arrested); during May 2007 when defendant, who was not in custody, made an unsolicited phone call to Det. Koppel (Finding 18); and on September 3, 2009 (Finding 22).

These statements should not be suppressed, because, applying the factors set forth in Brown, defendant was not in custody when she made these statements.

### Volunteered statements

Volunteered statements, that is, those which are not the result of interrogation, but are made spontaneously, are not subject to the advice of rights requirement of Miranda v. Arizona. United States v. Menteer, 350 F.3d 767, 770 (8th Cir. 2003); United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996). Defendant made such statements on September 3, 2009 (Findings 26, 28, and 33a). The follow-up question by Agent Brady, described in Finding 33b, should not be suppressed because it followed and related to corroborating the information volunteered by defendant about her sister. United States v. Rommy, 506 F.3d 642, 644 (2d Cir. 2007).

These statements should not be suppressed.

### Non-Mirandized custodial statements

Nevertheless, as the government has admitted, several of the defendant's statements must be suppressed because they were made by her when she was in custody and being questioned by the police, without having been advised of her Miranda rights. The statement of a defendant made in response to a question asked without the suspect being advised of her Miranda rights should be suppressed.[13] The record indicates that

---

[13] Of course, there may be a basis for avoiding the exclusionary rule, such as a question seeking strictly biographical information, see
(continued...)

such statements were made on February 10, 2004 (Findings 4-6); April 30, 207 (Finding 12); and September 3, 2009 (Finding 27).

These statements should be suppressed. Such statements may be used, however, to impeach contrary testimony at trial. <u>Harris v. New York</u>, 401 U.S. 222, 226 (1971).

### 4. Evidence obtained from retail stores

The government has items of evidence acquired by law enforcement from the retail stores involved in the incidents with defendant. These items are set forth in the government's memoranda and include items described in Findings 13, 16, 29, 30, 35, and 37. Defendant has not established that she has or had a legitimate expectation of privacy in the items seized. <u>United States v. James</u>, 534 F.3d at 872-73.

This evidence should not be suppressed.

### 5. Other items of evidence

The parties have indicated possible issues over the admissibility of evidence relating to other retail store incidents, evidence seized in the execution of a search warrant on defendant's residence, evidence seized in the search of defendant's vehicle, wiretap statements made by defendant, and grand jury statements made by defendant. These subjects were not evidenced during the suppression hearings held by the court. About them, the record presented no evidentiary basis for rendering findings of fact and conclusions of law. During the hearing counsel for the government stated that such information has been disclosed to the defendant and that the government does not intend to offer them into evidence in its case-in-chief at trial; however, if appropriate, the government may use them as impeachment of the defendant's case.

**CONCLUSION**

For the reasons set forth above and to the extent set forth above,

---

[13](...continued)
<u>Penn. v. Muniz</u>, 486 U.S. 582, 600-02 (1990). Such is not the case with these statements.

**IT IS HEREBY RECOMMENDED** that the motions of the defendant to suppress evidence (Docs. 13 oral, 52, and 68) be sustained as to the statements made by defendant on February 10, 2004 (Findings 4-6); and April 30, 207 (Finding 12); and September 3, 2009 (Finding 27). In all other respects the motions should be denied.

**IT IS HEREBY ORDERED** that the motion of the government for a determination of the admissibility of arguably suppressible evidence (Doc. 14 oral) be denied as moot.

The parties are advised that they have until on or before June 15, 2010, to file written objections to this Order and Recommendation. The failure to file timely written objections waives the right to appeal issues of fact.

                                             **/S/   David D. Noce**
                                           **UNITED STATES MAGISTRATE JUDGE**

Signed on June 1, 2010.